RHAMSTINE v. SPARKS–WITHINGTON CO.

No. 5856.

Circuit Court of Appeals, Sixth Circuit.

May 6, 1932.

J. M. Kisselle, of Detroit, Mich. (Barnes & Kisselle, of Detroit, Mich., on the brief), for appellant.

E. A. Thompson, of Syracuse, N. Y. (Leland S. Bisbee, of Jackson, Mich., on the brief), for appellee.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

HICKENLOOPER, Circuit Judge.

Complainant below appeals from a decree dismissing his bill for infringement of claims 1, 2, 3, 4, 6, 7, and 10 of patent No. 1,281,877, for an automobile horn, issued October 15, 1918, upon an application filed by Etienne Teste and Eugene Malivert, August 19, 1913. The District Court held the claims invalid for want of patentable novelty over patent No. 870,074, issued November 5, 1907, to John Astrom, upon an application filed February 2, 1905, and/or over the commercial devices manufactured and sold by Astrom prior to the filing date of the patent in suit. Claim 3 is typical and is printed in the margin.[1]

At the time that both Astrom and Teste entered the field it was already old to produce, or reproduce sound by causing vibration of a relatively thin diaphragm, either in unconfined air, or by use of a sound box and amplifying horn by which the intensity of the sound waves produced by the diaphragm was reduced and the sound amplified. The desired vibration of the diaphragm was commonly produced by purely mechanical means, as in the phonograph or victrola; by electromagnets, as in the telephone; or by steam or compressed air, as in the patent to Shaw, No. 212,157, (1879). The devices of this patent to Shaw, and of the French patent to M. Guetton-Dangon, No. 444,784, issued August 16, 1912, differ in basic principle from those of the patents to Astrom and to Teste, in that in the former the air inlet chamber is on the side of the diaphragm opposite to that from which the sound is emitted, while in the latter a cylindrical tube constitutes the outlet for the emission of sound, passing through the air inlet chamber which surrounds it, and resting against the face of the diaphragm. Thus in both Astrom and Teste, when compressed air or steam is admitted to the air inlet chamber, the flexible diaphragm is forced away from the outlet tube, permitting the air to escape around the edge of the tube and momentarily relieving the adjacent pressure. With this decrease in pressure, the diaphragm, being resilient, returns to its former position closing the outlet tube, and this cycle is repeated with great rapidity and a series of vibrations is set up in the diaphragm, continuing as long as pressure is maintained in the air inlet chamber. All four devices depend upon the valve-like action of the vibrating diaphragm to produce the sound, but in the devices of the Shaw and the French patent the escaping air is discharged to the rear of the horn, while in Astrom's and Teste's devices this escaping air is emitted, together with the sound waves directly set up by the vibrating diaphragm, into the air outlet tube.

Theoretically, at least, the air escaping from the air inlet chamber would be liberated in waves corresponding closely to the number of vibrations of the diaphragm, thus increasing the volume of sound if the vibrations of such air waves were within the audible range. It was also well known long prior to Astrom that the audible range of sound waves was between 16 to 20 per second for very low notes, and perhaps 12,000 per second for high, strident, or piercing sounds (the range of vibration in the tones of orchestral instruments being between 40 and 4750 per second); that noise was due to irregular and confused impulses; that the heavier the diaphragm the greater the pressure required to operate the horn, and, the diameter remaining the same, the higher would be the note produced by its vibration; that a musical tone was produced by a vibrating column of air passing through a brass horn or trumpet; and that the intensity or pressure of sound waves produced in a confined space could be reduced, and the sound amplified, by the simple device of a comparatively short flaring trumpet, that is, short as compared to musical instruments.

But the device of the patent in suit is said to differ from the Astrom device chiefly in two particulars: (1) it is said that Astrom shows a diaphragm which is relatively thick and "rests loosely upon the upper edge" of the outlet tube, while the patent in suit shows a relatively thin membrane or diaphragm "held under tension against the inlet end of said outlet tube, and means for regulating at will the pressure with which the membrane presses against the end of the tube"; and (2) Astrom shows no trumpet, while the patent in suit provides for such trumpet or resonator (in the claim quoted spoken of as "a sound amplifying trumpet") and speaks of the sound produced as having "also a very agreeable pitch because of the fact that the end of the air tube on which is applied the

---

[1] 3. A sound generator comprising a box constituting an air inlet chamber provided with a nipple, a compressed air supply pipe secured to said nipple, the air inlet chamber presenting an opening on one of its faces, a thin flexible membrane covering said opening, means for securing said flexible membrane in position, a sound amplifying trumpet, an air outlet tube passing through the air inlet chamber, and forming the mouthpiece and the commencement of the tube of said trumpet, the membrane being held under tension against the inlet end of said outlet tube, and means for regulating at will the pressure with which the membrane presses against the end of the tube.

membrane or diaphragm, constitutes the mouthpiece of the trumpet or resonance tube."

These differences were thought by the British Court of Appeal to be sufficient to warrant the issue of a patent to Teste and Malivert, as an improvement upon the Astrom device (Teste v. Coombes, 1923 Patent Reports 378), but that court did not have before it evidence of the commercial devices actually manufactured and sold by Astrom prior to the filing date of Teste. In this commercial device Astrom lengthened the wall of his outlet tube so as to bring its inner edge into tension against the diaphragm, and provided adjusting means whereby this tension might be increased or decreased. Nor was this anticipating commercial use before the Patent Office, where the tension upon a relatively thin diaphragm was urged and accepted as the true inventive step. Of course Astrom says nothing in his patent as to the thickness of his diaphragm, and his patent drawings are purely diagrammatical. All thicknesses were open to the manufacturers, and Astrom testified that he had experimented with all thicknesses, including those "as thin as paper and as heavy as one-sixteenth of an inch thick." But aside from this, it was then well known, as we have already said, that the stiffer the diaphragm, and the greater the tension upon the outlet tube, the greater was the pressure required to operate the horn and the higher the note produced,—that the three elements of thickness of the diaphragm, tension, and pressure were inter-related and within the realm of selection, each to be designed with regard to operating conditions and the results desired.

In view of this anticipating use and knowledge in the art, we find no teaching in the patent in suit which would indicate a substantial advance—an improvement over what had been known and done before—unless it be in the use of the trumpet or resonator. Astrom used a short flaring horn upon his commercial devices, such as is also shown in the French patent No. 444,784 of 1912, and, to a less extent, in the patent to Shaw. These may well be regarded as merely amplifying devices not designed with a view to obtaining a musical note, or to utilizing the principle of music that desired tones may be produced by a vibrating column of air passing through a trumpet, bugle, or horn. Every such musical instrument has its fundamental note, and variations therefrom may be produced by modifying the number of vibrations of the column of air (lip control), or by modifying the length of such column, as is done by the valves of the cornet or French horn. In a simple trumpet, however, the purest notes are obtained where the vibrations of the air column are adapted to correspond to the natural or fundamental period of vibration of the trumpet, or, in the present connection, where the diaphragm is caused to move in synchronism with the resonance of the horn, determined largely by its length.

Had the desired period of vibration never before been produced by artificial means in a musical instrument, invention might reside in this adaptation of a vibrating diaphragm to accomplish the desired result, but for many years this had been done by the reed instruments, the closest analogy being the hand-blown automobile horn with its curled trumpet-like tube. We do not think that it required invention to substitute the vibrating diaphragm for the vibrating reed, especially since it was well known after Astrom's time that the period of vibration of the diaphragm could be controlled by regulating its thickness and tension and the pressure of the air to be applied.

But were we to concede that some unsolved problem of control of the period of vibration of the air column was presented by the substitution of a thin diaphragm for a reed, or by the escape of air under pressure into the mouthpiece of the trumpet, yet, even then, it would be a sufficient answer to appellant's contention to say that the teachings of the patent in suit are not addressed to a solution of this problem and the claims do not cover such adaptation of the period of vibration of the diaphragm to the natural period of vibration of the trumpet. The trumpet of the patent in suit is to be regarded only as an amplifying device, or at best a device to give added resonance to a note which might otherwise be somewhat harsh. Used for such purpose, the horn or trumpet was not new, or, certainly, its use did not require the exercise of more skill and ingenuity than would be possessed by one reasonably skilled in the art of acoustics.

The decree of the District Court is affirmed.